**NEW HAMPSHIRE BALL BEARINGS,
Plaintiff–Appellee,**

v.

**AETNA CASUALTY AND SURETY
COMPANY, Defendant–
Appellant.**

**NEW HAMPSHIRE BALL BEARINGS
INC., Plaintiff–Appellant,**

v.

**AETNA CASUALTY AND SURETY COM-
PANY, and American Motorists Insur-
ance Company, Defendants–Appellees.**

**NEW HAMPSHIRE BALL BEARINGS
INC., Plaintiff–Appellee,**

v.

**AETNA CASUALTY AND SURETY
COMPANY, Defendant–
Appellee.**

**American Motorists Insurance Company,
Defendant–Appellant.**

**Nos. 94–1540, 94–1544 and 94–1545.**

United States Court of Appeals,
First Circuit.

Heard Oct. 3, 1994.

Decided Jan. 5, 1995.

this reference. None requires comment.

Stephen H. Roberts, with whom Ouellette, Hallisey, Dibble & Tanguay, P.A., Dover, NH, Allan B. Taylor and Dan, Berry & Howard, Hartford, CT, were on brief for Aetna Cas. and Sur. Co.

James M. Sweet, with whom Susan M. Kennedy, Drinker Biddle & Reath, DC, Richard C. Nelson and Nelson, Kinder, Mosseau & Gordon, Manchester, NH, were on brief, for American Motorists Ins. Co.

Michael C. Harvell, with whom John E. Peltonen, Thomas S. Burack, Thomas M. Closson and Sheehan, Phinney, Bass & Green Professional Association, Portsmouth, NH, were on brief, for New Hampshire Ball Bearings.

Before TORRUELLA, Chief Judge, BOWNES, Senior Circuit Judge, and CYR, Circuit Judge.

TORRUELLA, Chief Judge.

This is the second of two insurance coverage, declaratory judgment actions to come before the court in recent months on appeal from the United States District Court for the District of New Hampshire. *See Mottolo v. Fireman's Fund Ins. Co.*, 43 F.3d 723 (1st Cir.1995). Both cases raise similar issues. The question we decide on this appeal is whether a general liability insurance policy which provides coverage for property damage that results from an "occurrence" applies to the intentional dumping of hazardous waste. We conclude that, as a matter of New Hampshire law, the "occurrence" provision does not apply to the facts of this case and that, therefore, the defendant insurance companies are not obligated to indemnify the plaintiff-appellee. Because we conclude that the district court decision to the contrary must be reversed, and judgment entered in favor of the defendants-appellants, we need not reach the issue of what triggers coverage under the policies, nor need we interpret the

owned property exclusion. Likewise, the damages questions decided below are not necessary to our conclusion.

## I.

### BACKGROUND

New Hampshire Ball Bearings, Inc. ("NHBB"), manufactures precision ball bearings for use in the aerospace industry. It has operated a manufacturing facility ("the plant") located approximately one-quarter mile west of the South Municipal Well ("the South Well") in Peterborough, New Hampshire since 1957. NHBB relies heavily on the use of solvents for essential degreasing and cleaning functions during the manufacturing process. These solvents include the volatile organic compounds ("VOCs") trichloroethylene ("TCE") and 1,1,1–trichloroethane ("TCA").

Contamination of the South Well was discovered in 1982 during the first routine sampling of the Peterborough water supply for VOCs. This contamination was traced to NHBB. No other potential responsible parties have been identified. In May of 1983, the United States Environmental Protection Agency ("EPA") put the South Well and contiguous areas on the National Priorities List, making them eligible for funding under the Comprehensive Environmental Response Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601–75, *amended by* the Superfund Amendments and Reauthorization Act of 1986, Pub.L. No. 99–499, 100 Stat. 1613 (1986).

NHBB is required to clean up hazardous waste contamination at the South Municipal Well in Peterborough, New Hampshire ("the South Well") pursuant to a 1986 consent order entered into with the EPA and an Administrative Order issued by EPA on June 19, 1990. A feasibility study has indicated that cleanup of the South Well will take 19 to 32 years.

In 1987, NHBB brought this action against Aetna Casualty & Surety Company ("Aetna") and American Motorists Insurance Company ("AMICO"), seeking a declaration that Aetna and AMICO are obligated to indemnify NHBB for its environmental cleanup costs at the South Well. Following a fourteen-day bench trial, which included an evidentiary view of the NHBB plant and the South Well, the district court issued a 34–page Order containing detailed findings with respect to NHBB's use and disposal of solvents at the NHBB plant. The district court concluded that NHBB's practice for disposing of solvents led to pervasive leaking, overflowing and intentional discharging of solvents onto the ground, leading to contamination of the South Well through the groundwater.

Among the pertinent findings by the district court are the following. NHBB used tanker trailers to dispose of waste liquids from the plant. The original trailer had a capacity of 250 gallons while subsequent trailers had capacities of 500 to 750 gallons. When the trailer filled up, the normal practice was for NHBB employee's to dump its contents at the town dump. The district court found, however, that "about twice a year because of inclement weather, solvents and waste were discharged on the NHBB premises which subsequently went into the groundwater." The district court concluded that "[t]hese discharges were not accidental."

The court also noted that on other occasions tanks would accidentally overflow, discharging solvents onto the ground at the plant. This overflowing continued, notwithstanding some efforts by NHBB to curtail it. In each year between 1957 and 1983, solvents were spilled onto the ground at the plant. A tumble sump used to store waste occasionally overflowed, causing solvents in free phase and dissolved form to spill onto the ground and flow through a discharge pipe into a nearby brook. In 1982, a roof tank with a capacity of 275 gallons leaked TCA through a ruptured pipe onto the ground at the plant.

The court also found that wastes were discharged from sinks, floor drains and roof drains at the plant onto the ground and wetlands of the plant, and into the town sewer and a nearby brook. Some of the wastes flowed into the wetland area of the plant while others flowed into a brook near the plant. The court found that NHBB was still discharging volatile compounds from its outfalls in late 1982.

In conclusion, the district court made the following findings of fact:

1. During the 1950's, 1960's and early 1970's, the public and industry were not generally aware of the threat which hazardous wastes posed to the environment in general and groundwater in particular.

2. NHBB intentionally discharged solvents onto the soil and top surface.

3. NHBB's contamination of the soil and wetlands was intentional, not fortuitous.

4. At the time of its intentional discharge, NHBB did not understand the effect its discharge of solvents would have on the groundwater.

5. NHBB's contamination of the groundwater was unintentional.

Based on these findings, the district court held that NHBB is entitled to indemnification from Aetna for expenses related to the investigation and cleanup up of the *groundwater* at the South Well, but not the soil or wetlands, pursuant to Aetna's general liability insurance policy in effect for the period July 1, 1982 to July 1, 1983.[1] The court ordered Aetna to reimburse NHBB in the amount of $14,213,199.94 and ordered Aetna to defend NHBB in any related suits. 848 F.Supp. 1082.

## II.

### STANDARD OF REVIEW

■ We review determinations of state law made in a bench trial of a diversity action *de novo*. *Williams v. Poulos*, 11 F.3d 271, 278 (1st Cir.1993); *Blanchard v. Peerless Ins. Co.*, 958 F.2d 483, 487 (1st Cir.1992). The district court's findings of fact will be upheld in the absence of clear error. Fed. R.Civ.P. 52(a); *Williams*, 11 F.3d at 278. In other words, we will defer to the district court's findings of fact unless we form " 'a strong, unyielding belief that a mistake has been made.' " *Cumpiano v. Banco Santander Puerto Rico*, 902 F.2d 148, 152 (1st Cir. 1990).

The clearly erroneous standard also ordinarily applies when we review a trial court's resolution of mixed questions of fact and law. *See In re Extradition of Howard*, 996 F.2d 1320, 1328 (1st Cir.1993) ("the more fact dominated the question, the more likely it is that the trier's resolution of it will be accepted unless shown to be clearly erroneous"). If a trial court "bases its findings upon a mistaken impression of applicable legal principles," however, we are not bound by the clearly erroneous standard. *LoVuolo v. Gunning*, 925 F.2d 22, 25 (1st Cir.1991) (quoting *Inwood Laboratories v. Ives Laboratories*, 456 U.S. 844, 855 n. 15, 102 S.Ct. 2182, 2189 n. 15, 72 L.Ed.2d 606 (1982)).

■ In addition, we note that the district court properly found that, because there is no underlying state court lawsuit in this case, the burden shifting framework of New Hampshire's declaratory judgment act, N.H.Rev.Stat.Ann. § 491:22, does not apply and the burden of establishing coverage remains with the plaintiff, NHBB. *See Town of Allenstown v. National Casualty Co.*, 36 F.3d 229, 232 (1st Cir.1994).

## III.

### DISCUSSION

■ Aetna is required to indemnify NHBB for monies it is legally obligated to pay because of property damage caused by "an occurrence." The policy defines "occurrence" as "an accident ... which results in ... property damage neither expected nor intended from the standpoint of the insured." The district court found that NHBB intentionally contaminated the soil and wetlands but did not realize the effect its pollution would have on the groundwater. The narrow issue we decide in this case is whether NHBB's contamination of groundwater with hazardous waste is an "occurrence" or an "accident" under those circumstances.

In *Mottolo v. Fireman's Fund Ins. Co.*, 43 F.3d 723 (1st Cir.1995), we analyzed the law

---

1. The district court found that the "trigger date" for purposes of determining insurance coverage was October 1982 (when the contamination was discovered by the State of New Hampshire).

AMICO's policies were no longer in effect as of October 1982 and, consequently, the court ruled that they did not provide coverage for the contamination.

of New Hampshire with respect to "occurrence" policy provisions. We will briefly summarize the salient principles. The New Hampshire Supreme Court construes the term "accident" in the context of "occurrence" coverage to mean " 'an undesigned contingency, ... a happening by chance, something out of the usual course of things, unusual, fortuitous, not anticipated, and not naturally to be expected,' " *Jespersen v. U.S. Fidelity & Guar. Co.*, 131 N.H. 257, 260, 551 A.2d 530 (1988) (quoting *Vermont Mutual Ins. Co. v. Malcolm*, 128 N.H. 521, 523, 517 A.2d 800 (1986) (other citations omitted).

In *Providence Mutual Fire Insurance Co. v. Scanlon*, 138 N.H. 301, 638 A.2d 1246 (1994), the Court articulated the test for determining whether there is an accident as follows:

> "If the insured did not intend to inflict the injury on the victim by his intentional act, and the act was not so inherently injurious that the injury was certain to follow from it, the act as a contributing cause of injury would be regarded as accidental and an 'occurrence.' "

*Scanlon*, 638 A.2d at 1249 (quoting *Vermont Mutual*, 128 N.H. at 524, 517 A.2d 800). Under *Scanlon*, NHBB's actions were not "accidental" if either 1) it intended to inflict the injury or 2) its actions were "inherently injurious."

The district court's findings that NHBB's intended to contaminate the top soil and wetlands, but not the groundwater, raise the question whether those "injuries" can be divided for purposes of determining whether NHBB "intended to inflict *the injury* on the victim by his intentional act." We have serious doubts that the intended injuries to the top soil and wetlands are divisible from the unintended injury to the groundwater. *See Lumbermens Mutual Casualty Co. v. Belleville Indus.*, 938 F.2d 1423, 1427–28 (1st Cir. 1991) (cautioning against microanalysis of a continuing pattern of pollution). We need not decide that question here, however, because we find that NHBB's intentional actions were inherently injurious within the meaning of *Scanlon*.

The test of "inherently injurious" conduct under *Scanlon* is that "an insured's intentional act cannot be an 'accident' when it is so inherently injurious that 'it is certain to result in some injury, although not necessarily the particular alleged injury.' " *Green Mountain Ins. Co. v. Foreman*, 138 N.H. 440, 441–43, 641 A.2d 230, 232 (1994) (quoting *Scanlon*, 138 N.H. 301, 638 A.2d at 1249). In determining whether an insured's actions were certain to result in some injury, New Hampshire law instructs that the reviewing court look at "the character of the act viewed, with reference to the insured, as a cause of injury." *Jespersen*, 131 N.H. at 260, 551 A.2d 530 (quoting *Vermont Mutual*, 128 N.H. at 524, 517 A.2d 800). This has been interpreted as an objective standard. "[T]he Court does not look to the actor's subjective intent that the result in question occur, but rather, the Court 'may infer that the actor's state of mind was the same as a reasonable person's state of mind would have been.' " *King v. Prudential Property and Cas. Ins. Co.*, 684 F.Supp. 347, 349 (D.N.H.1988) (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, *Prosser and Keeton on the Law of Torts* § 8, at 35–36).

Although the district court cited much of the above New Hampshire law, it ultimately relied on New Jersey law in making its determination that NHBB's intentional discharge of solvents was an "occurrence." Citing *Morton International Inc. v. General Accident Insurance Co.*, 134 N.J. 1, 629 A.2d 831 (1993), the district court sought to determine "whether exceptional circumstances exist that objectively establish [NHBB's] intent to injure." This test does not reflect the law of New Hampshire. By looking for objective evidence from which the court could infer NHHB's *subjective intent* to injure the groundwater, the court ignored the objective nature of the inquiry required by *Vermont Mutual* and its progeny. Although we could remand to the district court for reconsideration under the appropriate legal standard, we are perfectly equipped to apply the proper legal standard to the factual findings of the district court.

As we interpret it, the test that emerges from *Vermont Mutual* and its progeny is the following: would a reasonable company in

NHBB's position know that its intentional dumping and contamination of the soil and wetlands with hazardous waste was certain to result in some injury to property, although not necessarily the particular injury to the groundwater. To this question, our answer is yes. In our view, the district court's findings that 1) NHBB intentionally contaminated the soil and wetlands—a finding that was not contested on appeal; 2) the dumping was done in a reckless manner with no perceptible concern for whether the materials would migrate from the NHBB site; and 3) much of the waste flowed directly into a nearby brook, foreclose any serious argument that a reasonable company would not have known that the dumping was certain to cause some injury to adjacent property.

NHBB nonetheless presses the argument that it did not intend to injure the groundwater. The *Vermont Mutual* Court rejected the argument that an event is an "accident" within the meaning of the policy language if the insured did not expect or intend the injury that resulted: "[t]he policy does not condition coverage on the fortuitous nature of the victim's injury, but on the accidental character of the insured's act." *Vermont Mutual*, 128 N.H. at 524, 517 A.2d 800. As the New Hampshire Supreme Court stated in *Jespersen*: "[b]ecause their act was inherently injurious, it is of no consequence that the Jespersens have sworn, without contradiction, that they did not intend to cause the alleged injuries." *Jespersen*, 131 N.H. at 261, 551 A.2d 530. The fact that NHBB did not intend to injure the groundwater is irrelevant.

We also think this case falls within the factual ambit of our decision in *Great Lakes Container Corp. v. National Union Fire Ins. Co.*, 727 F.2d 30 (1st Cir.1984). In *Great Lakes*, we held, pursuant to New Hampshire law, that there was no "occurrence," under an insurance policy similar to that in this case, because the insured discharged chemical pollutants on its land "as a concomitant of its regular business activity." *Id.* at 33. The facts found by the district court, and recited herein, clearly establish that NHBB discharged chemical pollutants as a concomitant of its regular business activity. The district court attempted to distinguish *Great Lakes* by pointing out certain facts apparently from

which it could be inferred that the company in *Great Lakes* subjectively intended to contaminate the water supply. The subjective intent to pollute was not relevant to our decision in *Great Lakes*. *Great Lakes* stands for the simple proposition that a company which engages in systematic pollution as a concomitant of its normal business practice cannot claim that such pollution was "accidental." *See Belleville*, 938 F.2d at 1429 (surveying similar decisions in other circuits). Thus, our analysis in *Great Lakes* applies with equal force to the facts of this case.

## IV.

### CONCLUSION

For the reasons stated herein, the district court erred in finding that Aetna was required to indemnify NHBB for costs associated with its investigation and cleanup of groundwater contamination at the South Municipal Well site in Peterborough, New Hampshire. We hold that, as a matter of New Hampshire law, NHBB's contamination of the groundwater was not an "occurrence" within the meaning of the insurance policy issued by Aetna to NHBB. *We therefore reverse the judgment below, to the extent it is inconsistent with this opinion, and enter judgment for Aetna and American Motorists Insurance Company.*